Filed 6/24/24  P. v. Olguin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL OLGUIN,<br><br>Defendant and Appellant. | F085034<br><br>(Super. Ct. No. BF176390A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush and Brian M. McNamara, Judges.†

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

† Judge Bush presided over the in camera hearings; Judge McNamara presided over all other hearings pertinent to this appeal.

Defendant Daniel Olguin was charged with first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189 [count 1]) and assault by a life prisoner[2] by any means of force likely to produce great bodily injury that resulted in the victim's death (§ 4500 [count 2]). The information further alleged: (1) as to count 1, defendant was previously convicted of first degree murder (§ 190.2, subd. (a)(2)); and (2) as to both counts, he was previously convicted of murder, a qualifying "strike" under the Three Strikes law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)) and a serious felony (§ 667, subd. (a)(1)). Following a trial, the jury found defendant guilty as charged. In a bifurcated proceeding, the trial court found true the prior conviction allegations. Defendant received life without the possibility of parole plus five years for the prior serious felony enhancement on count 1.[3] He was ordered to pay—among other things—$19,945.87 in victim restitution pursuant to section 1202.4, subdivision (f).

On appeal, defendant asks us to review materials disclosed at in camera hearings to determine whether he was improperly denied access to evidence favorable to his defense. He also contends (1) the trial court erroneously admitted into evidence custodial statements obtained in violation of his Fifth Amendment rights; (2) alternatively, the court should have redacted said statements, particularly his "no comment" responses and references to drug use; (3) the victim restitution order should be modified because the

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] The parties stipulated defendant "had been previously convicted of felonies in San Bernardino County case FSB051357-3 and as a result of those convictions had been sentenced to a maximum term of Life in state prison in California" and "when he acted on July 15th, 2018, [he] was serving that Life sentence."

[3] The trial court also imposed life without the possibility of parole plus five years for the prior serious felony enhancement on count 2 but stayed execution thereof pursuant to section 654.

$19,945.87 amount was miscalculated; and (4) a minute order should be corrected because it conflicted with the court's oral pronouncement at sentencing.

We have reviewed the materials disclosed at the in camera hearings and conclude the trial court did not abuse its discretion when it ordered limited disclosure thereof. We also conclude (1) at the time of defendant's statements to law enforcement, he was not in custody within the meaning of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the court did not abuse its discretion when it decided not to redact defendant's "no comment" responses and references to drug use; (3) defendant forfeited his claim as to the victim restitution order; and (4) correction of the aforementioned minute order is warranted.

## STATEMENT OF FACTS

### I. Prosecution's case-in-chief

On July 15, 2018, at approximately 9:00 p.m., a Kern Valley State Prison correctional officer was conducting a security check and collecting inmate mail when he passed by the cell occupied by defendant and Eric Moreno. The officer saw Moreno "on the cell floor hog tied with some white cloth." Specifically, Moreno was "laying on his stomach" and his neck, wrists, and ankles were "all tied in one spot" "directly behind his back." Prior to the officer's discovery, other routine security checks, dayroom releases, and "pill line" releases were conducted without incident and none of the inmates—including defendant and those in neighboring cells—alerted prison personnel about any issues involving Moreno.

The officer asked defendant, who was "sitting on the bottom bunk" and "drinking some water," if Moreno "was okay." Defendant signaled "no" by shaking his head. A medical emergency alarm was activated. After defendant was restrained and removed from the cell, officers and medical staff attended to Moreno, who was unresponsive. Moreno was so tightly bound that marks were left on his neck, wrists, and ankles. He also had abrasions and contusions on his face, arms, and legs. The ligatures were cut,

3.

cardiopulmonary resuscitation was performed, and an automated external defibrillator was administered. Moreno was subsequently transported to a hospital where he was pronounced dead at around 10:00 p.m.

Meanwhile, a search of defendant and Moreno's cell revealed various bloodstains as well as "[a] toothbrush with [an] altered end." There was no blood on the toothbrush. Three "torn" "white sheets of linen" "fashioned as . . . ligature[s]" were retrieved. Defendant was placed in a holding cell and subjected to a "full unclothed body search." Nothing was found on his person. Defendant had redness on his knuckles, a scratch on his chest, and bloodstains on his clothing, but he was not bleeding.

An autopsy was carried out on July 26, 2018. The forensic pathologist opined "[t]he cause of death is ligature strangulation" and "[t]he manner of death is homicide death at the hands of another." He highlighted the "horizontal mark rather than an up sloping mark" on the neck; numerous hemorrhages and fractures in the neck; and "pinpoint hemorrhages" (petechiae) in the eyes resulting from the compression of blood vessels in the neck.

## II.     Defense's case-in-chief

### a. *Testimony of D.S.*

D.S. testified he was an inmate porter whose duties and responsibilities included "pass[ing] out food," "collect[ing] the food trays," and "just clean[ing] up." On July 15, 2018, sometime before 7:00 p.m., he was "out sweeping and mopping" when he heard defendant and Moreno arguing in their cell. D.S. went to the cell and "asked them what they were arguing about." Moreno "stated . . . it was none of [D.S.'s] business" while defendant "ask[ed] [D.S.] to tell [Moreno] to kick back, to chill out." Moreno—who appeared "agitated" and "really angry"—"kept saying liar" and "hit [defendant] in the back of the head," but the blow "didn't faze [defendant] much." In turn, defendant shoved Moreno. D.S. told Moreno to "chill out" and "try to talk to [defendant]" and the cellmates "both stopped for a minute." When D.S. walked away, however, he heard

4.

another commotion. He returned to the cell and saw Moreno hit defendant in the back of the head again. D.S. told Moreno to "chill out, calm down, stop" and left after "a minute and a half."

b. *Testimony of S.H.*

S.H. testified he inhabited the cell next to defendant and Moreno's. On July 15, 2018, he heard the cellmates arguing, Moreno being the noisier of the two. S.H. repeatedly called out to Moreno, but the latter "didn't respond." S.H. then summoned defendant—who "stepped up right away"—and advised him to "keep it down" because "[i]t is already late." Defendant "said yeah, no problem. We'll do that." Shortly thereafter, however, S.H. heard Moreno "screaming," "being vulgar," "saying bad words," and "getting louder and louder and louder." S.H. also heard "shoes squeaking on the floor" and "thumping around" and "could tell it was a fight, a physical fight."

c. *Defendant's testimony*

Defendant testified Moreno was "a childhood friend" and the two "grew up together." In April or May 2018, they became cellmates.

Moreno was scheduled to transfer to another facility on July 16, 2018. "His main source of income was selling heroin" and he wanted "some heroin so he could take [it] with him to make money at [the] prison that he was going to," but "nobody wanted to sell to him because he was leaving." On July 15, 2018, at approximately 6:45 p.m., Moreno asked defendant to purchase $400 worth of heroin on his behalf. Defendant refused because he "had no way of paying for it" and did not want to incur debt, which would have "put [his] life in danger" "if [he] d[id]n't pay that." When Moreno tried to convince defendant he would settle the debt in the future, defendant "basically told [Moreno] his word was no good." Angered, Moreno "started calling [defendant] names" and "started calling [defendant] a liar." D.S. arrived and asked "what was going on." After defendant told D.S. "everything is good," Moreno struck the back of defendant's head "out of nowhere." Moreno "calmed down for a minute" and D.S. left. However, Moreno

5.

"started up again" and "rushed" defendant, who "hit him back a few times" in self-defense. Twenty minutes later, the tussle stopped temporarily due to the cellmates' fatigue. At that point, S.H. "asked [defendant] how everything was going cuz he heard the arguments." Defendant said "everything is good."

Defendant "thought everything was done with" because he and Moreno "fought twice" and "everything was out of [Moreno's] system." Unfortunately, Moreno resumed his pleas for defendant to buy drugs before the officers "lock[ed] everybody down." Defendant continued to refuse and Moreno "got more and more agitated." Moreno "kept hitting" defendant and defendant "kept trying to block his swings." At some point, Moreno reached into his waistband and pulled out "an icepick," i.e., "an inmate-manufactured weapon." He tried to stab defendant's chest, but defendant "was able to wrestle [the weapon] away from him" and "tossed it" aside. Defendant could not sense precisely how much time had passed. Nonetheless, he estimated the assault lasted for "over two hours." At trial, defendant identified a toothbrush with "a metal piece from a nail clipper" "[f]iled to a point" as Moreno's weapon.

Before 9:00 p.m., when "there was going to be a check" by officers, Moreno "got past" defendant and "reach[ed] for th[e] weapon." Defendant "grabbed him" and "slammed him to the ground." Defendant "was just too tired to fight anymore," so he "grabbed the rope" and "tied [Moreno] up." The "rope" was about "five or six feet" of a braided bedsheet typically used to tie "paperwork," "books," or "anything . . . heavy" for weightlifting. Defendant bound Moreno's hands so "[h]e couldn't punch [him] no more." However, Moreno "started kicking," so defendant bound Moreno's feet. When defendant attempted to walk away, Moreno "tried to bite [his] ankle." As a result, defendant "wrapped the rope around [Moreno's] neck" "to keep him from trying to bite [him]."

Defendant testified he knew about Moreno's "conduct of violence" because he "grew up with him," they "were homeboys," and they shared "a cell together." In the cell, Moreno often "bragged about stabbing somebody to death." Thus, when Moreno

6.

took out a weapon on the night in question, defendant feared for his life and "thought [he] was gonna die." Defendant tied up Moreno "to just immobilize him to where he couldn't hurt [him] no more because he was trying every and anything he can to try and hurt [him]." Defendant "didn't do it" "to kill him," reiterating Moreno "was [his] friend."

On cross-examination, defendant acknowledged Moreno was no longer a threat after his hands and feet were bound and he could have simply moved to avoid Moreno's attempts to bite him. Defendant denied tying the ligature around Moreno's neck "that tight" and suggested Moreno's "constant pulling and struggling to try to get free" led to the tightening.

## DISCUSSION

### I. The trial court did not abuse its discretion when it ordered limited disclosure of certain prison inmate records.

Defense counsel moved for pretrial discovery of prison inmate records pertaining to Moreno. Two in camera hearings were conducted. Ultimately, the trial court ordered only certain "redacted memos of discovery that are discoverable [to] be provided to defense counsel." (Capitalization omitted.)

On appeal, defendant "respectfully requests the Court conduct an independent review of [the] *in camera* proceedings from which he was excluded below and for which the transcripts are presently sealed" "to ensure the trial court fully protected his discovery rights." The Attorney General "agrees that this Court should review the available record of materials" "to determine if any abuse of discretion is evident from any nondisclosures."

"Evidence Code section 1040, subdivision (b)(2), authorizes the trial court to decline to disclose confidential records maintained by a public entity when it finds the 'necessity for preserving the confidentiality of the information . . . outweighs the necessity for disclosure in the interest of justice.' [Citations.] This provision is applicable to prison inmate records. [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52,

7.

73.)  "There is a valid state interest in keeping certain prison inmate records confidential to (1) protect individuals, including informants inside and outside of prison, (2) ensure institutional security, and (3) encourage candor and complete disclosure of information concerning inmates from both public officials and private citizens."  (*Ochoa v. Superior Court* (2011) 199 Cal.App.4th 1274, 1280; accord, *People v. Landry*, *supra*, at p. 73.)  "In reviewing a claim of privilege under Evidence Code section 1040, the court may conduct an in camera hearing outside the presence of the defendant and his counsel."  (*People v. Kelly* (2018) 28 Cal.App.5th 886, 906.)

"The trial court's ruling is reviewed under the abuse of discretion standard."  (*People v. Suff* (2014) 58 Cal.4th 1013, 1059.)  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed . . . unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  [Citation.]' [Citations.]"  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)  In other words, "[a] court abuses its discretion when its ruling 'falls outside the bounds of reason.'  [Citation.]"  (*People v. Kipp* (1998) 18 Cal.4th 349, 371; see *People v. Brown* (2004) 33 Cal.4th 892, 901 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling . . . , itself correct in law, will not be disturbed on appeal merely because given for the wrong reason." ' "].)

We have examined the prison inmate records at issue unredacted and in their entirety.  Based on our extensive review, we find the court's ruling did not constitute an abuse of discretion.

## II.  Defendant was not in custody within the meaning of *Miranda* at the time of his statements to law enforcement.

### a.  *Background*

Immediately after Moreno was found in a compromised position, defendant was handcuffed and placed in a temporary holding cell.  On July 16, 2018, at approximately

8.

2:45 a.m., defendant was brought to the "facility A committee room" to speak about what had transpired.  Present were Correctional Sergeant Lozano, Correctional Officer Hernandez, Correctional Officer Lone, and the district attorney's investigator.  The following exchange took place:

| | |
|---|---|
| "SGT. LOZANO: | We're just ask a couple questions man, if you don't wanna talk to me that's fine.  I just gotta try and find out what happened, you know, I wasn't here at the beginning.  I'm just responding to this.  Uh, like I say if you don't, then we'll just take you back to your holding cell, whatever. . . .  [¶] . . . [¶] |
| | . . . Okay.  So, what happened today?  You guys had a disagreement, you guys just fuckin' personal?  I mean – |
| "[DEFENDANT]: | No, no comment. |
| "SGT. LOZANO: | No comment on that? |
| "[DEFENDANT]: | No comment.  [¶] . . . [¶] |
| "SGT. LOZANO: | . . . .  So, any disputes today, or lately, you guys were arguing? |
| "[DEFENDANT]: | No comment. |
| "SGT. LOZANO: | No comment on that? |
| "[DEFENDANT]: | Mm-mm. |
| "SGT. LOZANO: | Um, any reason why he was all tied up? |
| "[DEFENDANT]: | No comment.  [¶] . . . [¶] |
| "OFC. HERNANDEZ: | . . . .  I'm gonna ask you a question.  What's the last time he was alive? |
| "[DEFENDANT]: | Earlier today. |
| "OFC. HERNANDEZ: | About, more or less? |

"[DEFENDANT]:        Oh, I'm not sure man.

"OFC. HERNANDEZ:    About 7:00?  Or was it later than 7:00?

"[DEFENDANT]:        I'm not sure.

"OFC. HERNANDEZ:    No?

"[DEFENDANT]:        Yeah.

"OFC. HERNANDEZ:    Well, he passed away, so we're tryin' to determine the time of death.

"[DEFENDANT]:        Man, n-no comment.

"OFC. HERNANDEZ:    No comment?

"[DEFENDANT]:        No.

"OFC. HERNANDEZ:    Let me ask you this, when's the last time you used man?

"[DEFENDANT]:        When's the last time I used?

"OFC. HERNANDEZ:    Yeah.

"[DEFENDANT]:        It's been a minute now.  Four days.

"OFC. HERNANDEZ:    Four days?  What was it?

"[DEFENDANT]:        Three, or four days.  [¶] . . . [¶]

"SGT. LOZANO:        How about your cellie?  Did he party too or no?

"[DEFENDANT]:        A little bit.

"SGT. LOZANO:        Today?

"[DEFENDANT]:        No.

"SGT. LOZANO:        Not today.  When's the last time he used?  Do you know?

"[DEFENDANT]:        Probably the same time, a couple days ago.

"SGT. LOZANO:        The same time?

10.

"[DEFENDANT]:         Yeah.  [¶] . . . [¶]

"OFC. HERNANDEZ:      Uh, yeah.  Where did you get all the string?

"[DEFENDANT]:         Huh?

"OFC. HERNANDEZ:      All the stuff that he was tied up, did you just make it, or you already had it in the cell?

"[DEFENDANT]:         It was just layin' around the cell.

"OFC. HERNANDEZ:      It was just layin' around so you just said, 'fuck it, it's here, I'll use it – huh?

"[DEFENDANT]:         No comment.

"OFC. HERNANDEZ:      No comment.  Well, you shook your head as kind of yes so I'll take That as a yes.[4]  You wanna tell us why the whole thing happened or no?

"[DEFENDANT]:         No comment.

"OFC. HERNANDEZ:      No comment?  All right.  So, is it safe to say he was dead before 8:00 or no?

"[DEFENDANT]:         No comment.

"OFC. HERNANDEZ:      No comment?  All right. . . .  [¶] . . . [¶]

"SGT. LOZANO:         You want to take him back?

"OFC. HERNANDEZ:      Yeah all right, I'm gonna take you back and put you in the, uh, holding cell okay?

"[DEFENDANT]:         Okay.

"SGT. LOZANO:         And we're gonna take those handcuffs off, but like I say that will go back in your property, all right?

---

**4** Based on video footage of the interview (see fn. 5, *post*), after Officer Hernandez said, "It was just layin' around so you just said, 'fuck it, it's here, I'll use it," defendant initially raised his eyebrows and bobbed his head.  When Officer Hernandez said, "Huh," defendant shook his head and said, "No comment."

| "[DEFENDANT]: | Mm-hmm. |
|---|---|

"[DEFENDANT]:        Mm-hmm.

"SGT. LOZANO:        All right, man.

"OFC. HERNANDEZ:        All right?  All right, man, Prisoner go ahead and stand up.

"[DEFENDANT]:        Ah.

"OFC. HERNANDEZ:        You have (inaudible)

"[DEFENDANT]:        No."[5]

The prosecution moved in limine to admit into evidence defendant's foregoing statements.  Concurrently, defense counsel moved in limine to "exclude any statement that was made by the defendant pursuant to *Miranda*."  The trial court conducted a hearing pursuant to Evidence Code section 402.

Officer Hernandez, who was assigned to Kern Valley State Prison's investigative services unit, testified he was phoned at approximately 9:00 p.m. on July 15, 2018, and instructed to report to the prison to investigate a potential murder.  Sometime after midnight, he encountered defendant, who was handcuffed in the holding cell.  Later, Hernandez escorted defendant to the committee room, which was approximately 16 feet wide and 18 feet long; contained "two tables," "some chairs," and "two or three computers"; and was typically used by officers "to write [incident] report[s]" and "hold classification committees."  Hernandez, Lozano, Lone, and the district attorney's investigator possessed "standard equipment," i.e., "MP9 pepper spray, a baton, handcuffs, and keys."  None of them carried a firearm.  For the duration of the interview, defendant remained handcuffed and the door to the room was closed but unlocked.  A *Miranda* advisement was never given.  When asked whether it was the prison's standard procedure to handcuff an inmate removed from his regular cell, Hernandez replied:

---

[5] The jury watched a redacted video recording of the interview.

"Sometimes they're – they're not. They're always in restraints or we place them in the holding cell. Depending on what the nature of the incident is as to why they're placed in holding cell, sometimes they remain handcuffed or in waist restrain[t]s or they're unhandcuffed. It just depends on why they're placed in the holding cell."

When asked whether it was a "typical safety practice to place [an inmate] in restraints" if said inmate were "found with [his] cellmate deceased under suspicious circumstances," Hernandez answered, "Yes, sir."

Thereafter, the trial court granted the prosecution's motion in limine and denied defendant's motion in limine. It explained:

> "First with respect to the language used to summon him for questioning, there was no evidence presented as to language used; however the defendant was placed in a holding cell for several hours prior to questioning. Defendant was escorted in handcuffs to [the facility A committee room] where the questioning took place. The use of handcuffs is standard when transporting inmates in defendant's housing unit.

> "Second. . . . [T]he room was approximately 16 feet by 18 feet, the door to this room was unlocked but closed . . . during the interview. There were four officers present in the room. There were no firearms present. Visually the room used was as close to a neutral territory as would be available in a prison facility.

> "Third factor. There was no clear, significant indication that Mr. Olguin was confronted with evidence of his guilt since Sergeant Lozano conducted the interview by asking Mr. Olguin at the beginning of the interview so what happened today.

> "Fourth factor. Prior to any questioning, Sergeant Lozano told the defendant we're just asking a couple of questions, man. If you don't want to talk to me, that's fine. I'm going to try to find out what happened, you know. I wasn't here at the beginning and I'm just responding to this. Like I said, if you don't then we'll just take you back to your holding cell, whatever.

> "The time of that was 1:49 to 2:03 on the video. The defendant nods up and down at time 2:02. This was understood by the Court to be an acknowledgement and understanding of what Sergeant Lozano had communicated to Mr. Olguin.

13.

"From the video, Mr. Olguin did not show any hesitation in talking to Sergeant Lozano but rather seemed quite content to meet, talk, and respond to any questions he felt comfortable answering.

"These circumstances do not disclose that any additional pressure was exerted to detain Mr. Olguin in a coercive manner. Mr. Olguin was given the opportunity to leave the room if he requested to do so. No apparent additional degree of restraint was imposed on him to coerce him into participating in the interview beyond the everyday conditions of confinement. A reasonable person in Mr. Olguin's position would have realized that he could . . . end the questioning and leave before the end of the interview.

"When Mr. Olguin got into the interview room, he could have refused to talk. Mr. Olguin was not yet in formal custody on the case involving Mr. Moreno and the apparent focus of Sergeant Lozano's questioning was to find out what happened and gather information. The Court considered the four factors set forth above and . . . the ruling is it did not support that it was custodial interrogation. Specifically the physical surroundings of the interview room were not unduly coercive since it was a neutral environment and Mr. Olguin was not confronted with evidence of guilt. Finally, Mr. Olguin was given the opportunity to leave the interview room if he did not want to answer questions.

"Under the totality of the circumstances, Mr. Olguin was not in custody for purposes of Miranda and the protections of Miranda do not apply. . . ."

b. *Analysis*

"The Fifth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' [Citations.] To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation [citation], the [United States Supreme C]ourt adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation [citation]." (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339.) These measures apply to prison inmates. (*People v. Fradiue* (2000) 80 Cal.App.4th 15, 19 (*Fradiue*).) "A

14.

statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*Jackson*, *supra*, at p. 339.)

"Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*), quoting *Miranda*, *supra*, 384 U.S. at p. 444.) Generally, "[t]he test for *Miranda* custody is, ' "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' [Citation.]" (*Kopatz*, *supra*, at p. 80.) However, "[i]n formulating an appropriate test in a prison setting, . . . the usual test of whether a reasonable person would have believed he was free to leave ceases to be useful. [Citation.] Obviously, the inmate is not free to leave. The question must therefore shift to whether some extra degree of restraint was imposed upon the inmate to force him to participate in the interrogation. Four factors are significant in this inquiry: (1) the language used to summon the inmate for questioning, (2) the physical surroundings of the interrogation, (3) the extent to which the inmate is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain him. [Citation.]" (*Fradiue*, *supra*, 80 Cal.App.4th at p. 20.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*Kopatz*, *supra*, 61 Cal.4th at p. 80.) " 'When reviewing a trial court's determination that a defendant did not undergo custodial interrogation,' an appellate court accepts the trial court's findings of historical fact if supported by substantial evidence but independently determines 'whether, given those circumstances,' the interrogation was custodial. [Citation.]" (*Ibid.*; see *People v. Hawkins* (2004) 124 Cal.App.4th 675, 682 [" 'We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid

15.

value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' "].)

The record—viewed in the light most favorable to the judgment—shows defendant was brought to a "well-lit" (*Howes v. Fields* (2012) 565 U.S. 499, 515) room approximately 16 feet wide and 18 feet long. Upon entering, the door closed but stayed unlocked behind him. The room, which contained "two tables," "some chairs," and "two or three computers," was normally used by officers "to write [incident] report[s]" and "hold classification committees," presenting "as close to neutral territory as [wa]s available in the [prison]." (*People v. Macklem* (2007) 149 Cal.App.4th 674, 696). There is nothing in the record intimating the language used to summon defendant for questioning. Nonetheless, at the outset of the interview, Sergeant Lozano told defendant he would "just ask a couple questions" to "find out what happened" but "if [defendant] d[id]n't wanna talk to [him] that's fine" and officers would "just take [him] back to [the] holding cell, whatever." Defendant nodded in response. The interview, which lasted only a few minutes (cf. *Howes v. Fields*, *supra*, at p. 515 [five- to seven-hour-long interview]) consisted primarily of open-ended questions about what had occurred, why Moreno was tied up, where the ligatures came from, and when Moreno was last alive. In his appellate brief, defendant concedes "the interrogators may not have confronted [him] with direct or specific 'evidence of guilt' . . . ." For the duration of the interview, defendant appeared comfortable, exhibited a calm demeanor and voluntarily answered questions (albeit with a frequent "No comment"). Although defendant remained handcuffed, Hernandez testified this was a "typical safety practice" if an inmate were "found with [his] cellmate deceased under suspicious circumstances." None of the officers " '[u]sed a very sharp tone' " (*ibid.*) or threatened defendant (*ibid.*). Nor did any of them carry a firearm. (Cf. *ibid.* [armed deputies].) When defendant was told he would be returned to the holding cell, he said, "Okay."

16.

"In our view, under the totality of the circumstances presented, no restraints were placed upon defendant to coerce him into participating in the interrogation over and above those normally associated with his inmate status." (*People v. Fradiue*, *supra*, 80 Cal.App.4th at p. 21.) "Under the totality of the circumstances, he was not in custody for purposes of *Miranda*, the protections of *Miranda* did not apply, and the failure . . . to give a *Miranda* warning did not make his statements inadmissible." (*People v. Macklem*, *supra*, 149 Cal.App.4th at p. 696.)[6]

**III.     The trial court did not abuse its discretion when it decided not to redact defendant's "no comment" responses and references to drug use.**

a. *Background*

Following the trial court's ruling granting the prosecution's motion in limine (see *ante*, at pp. 13–14), the parties discussed whether the video recording and transcript of defendant's interview needed to be redacted. Regarding defendant's "no comment" responses, the court concluded they were "answer[s] in and of [them]sel[ves] as to a question" and would "be allowed." Regarding references to drug use, the prosecution argued:

> "Going to the drugs, I think the fact that the defendant states he was not using drugs and neither the victim was is very relevant. Intoxication, drug use all can affect both victim behavior as well as the defendant's own behavior and his mental state which are all significant issues in this case to be decided. . . . The issues are what happened inside of the cell. And whether people were under the influence of drugs is directly relevant to that determination for the jury. So the defendant statement whom is only one of two people alive in the cell about being under the influence is directly relevant to this case and so I would seek to admit that because it is a limited issue. [¶] . . . [¶]

---

[6] In light of this conclusion, we need not address defendant's claim of prejudicial error.

". . . The defendant said he used four days prior and the victim used a couple of days prior. Neither had used on the date of is directly relevant because mental state is an element of the crimes charged in this specifically malice. And the fact that being under the influence or lack of being under the influence of drugs when you're dealing with a crime for which the jury is going to decide what happened in a small cell is directly relevant. And the absence of drugs I think is very relevant. I think the whatever probative value exists of the fact that a prisoner used drugs is substantially outweighed in aiding the jury to determine what a particular person's mental state is when they are trying to decide if they committed murder for which there is only two people in a cell and only one will either testify about it."

The court agreed and decided not to redact the drug use references.[7, 8]

 b. *Analysis*

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Prejudice,' as used in Evidence Code section 352, is not synonymous with 'damaging.' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.) "Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial." (*Ibid.*; see *People v. Doolin* (2009) 45 Cal.4th 390, 439 [" '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' "].)

---

[7] We point out the video recording and transcript of defendant's interview omitted exactly which drug was ingested.

[8] The court ended up redacting statements alluding to defendant's gang ties.

18.

"Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Holford* (2012) 203 Cal.App.4th 155, 167–168; see *People v. Brown*, *supra*, 33 Cal.4th at p. 901 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling . . . , itself correct in law, will not be disturbed on appeal merely because given for the wrong reason." ' "].)

Here, we cannot conclude the trial court's ruling to be arbitrary, capricious, or patently absurd. To find probative value in defendant's "no comment" responses and references to his and Moreno's drug use a few days before the incident was not " 'outside the bounds of reason' " (*People v. Kipp*, *supra*, 18 Cal.4th at p. 371): the former—taken in context of the entire interview—helped to demonstrate defendant was not in custody within the meaning of *Miranda* (see *ante*, at pp. 8–17) while the latter was indicative of the mental states of both defendant and Moreno on the night of the incident. On their face, the challenged remarks were not of such nature as to inflame the emotions of the jury. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.) Indeed, they were brief, relatively innocuous, and " 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' [Citation.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.)

## IV.     Defendant forfeited his claim as to the victim restitution order.

a.  *Background*

The probation officer's report recommended $19,945.87 in victim restitution pursuant to section 1202.4, subdivision (f) based on receipts submitted by Moreno's family. At the September 28, 2022 sentencing hearing, the trial court advised defense counsel the victim restitution amount "was set at $19,94[5].87" and asked whether he had "[a]ny objection to that." Defense counsel replied, "Submit it to the Court." Likewise,

the prosecution did not object. The court remarked, "Okay. That's what the restitution will be set at this time." Defendant was subsequently ordered to pay $19,945.87 in victim restitution.

      b. *Analysis*

      "Section 1202.4, subdivision (f) provides for a direct restitution order 'in every case in which a victim has suffered economic loss as a result of the defendant's conduct.' " (*People v. Brasure* (2008) 42 Cal.4th 1037, 1074.) "The order is to be for an amount 'sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct.' " (*Id.* at pp. 1074–1075, quoting § 1202.4, subd. (f)(3).) "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1); accord, *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1319.)

      On appeal, defendant "objects to the ordering of an amount that exceeds the expenses actually incurred as established by the printed receipts." "A defendant wishing to argue on appeal that there is no factual basis for a restitution order must object on that ground in the trial court to preserve the issue for appeal." (*People v. Mays* (2017) 15 Cal.App.5th 1232, 1237.) Here, however, no such objection was raised. Defendant therefore forfeited his claim. (See *People v. Brasure*, *supra*, 42 Cal.4th at p. 1075 ["As the order for restitution was within the sentencing court's statutory authority, and defendant neither raised an objection to the amount of the order nor requested a hearing to determine it [citation], we do not decide whether the court abused its discretion in determining the amount."].)

**V. Correction of a September 28, 2022 minute order is warranted.**

At the September 28, 2022 sentencing hearing, the trial court imposed life without the possibility of parole plus five years for the prior serious felony enhancement on count 1. A September 28, 2022 minute order read in part:

> "AS TO COUNT 1, COURT IMPOSED LIFE WITHOUT POSSIBILITY OF PAROLE.
>
> "PLUS ENHANCEMENT FOR ALLEGATION NUMBER 4 AS TO COUNT 1 PURSUANT TO PC 667(A) OF 5 YEAR(S).
>
> "SENTENCE DOUBLED PURSUANT TO PENAL CODE SECTION 667(E).
>
> "DEFENDANT COMMITTED TO DEPARTMENT OF CORRECTIONS FOR THE TERM OF LIFE WITHOUT THE POSSIBILITY OF PAROLE AND FOR IMPOSED ENHANCEMENT(S) OF 5 YEAR(S)."

On appeal, defendant asks us to "order correction of the minutes for September 28, 2022 by deleting the inaccurate statement that the sentence in count 1 was doubled." According to the reporter's transcript of the sentencing hearing, the court did not appear to pronounce count 1's sentence was doubled pursuant to section 667, subdivision (e). "Conflicts between oral pronouncement of judgment and the minute order are presumed clerical, and generally are resolved in favor of the oral pronouncement." (*People v. Gonzalez* (2012) 210 Cal.App.4th 724, 744.) Since "[c]ourts may correct clerical errors at any time" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185), we shall "direct the trial court to correct the minute order to conform with the oral pronouncement of judgment" (*People v. Moses* (2011) 199 Cal.App.4th 374, 380).

21.

# **DISPOSITION**

The trial court is directed to correct the September 28, 2022 minute order to strike the following sentence on page 2:  "SENTENCE DOUBLED PURSUANT TO PENAL CODE SECTION 667(E)."  In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


LEVY, Acting P. J.


SMITH, J.

22.